1

2

3

4

5

6

7

8

9    UNITED STATES DISTRICT COURT

10    NORTHERN DISTRICT OF CALIFORNIA

11    SAN JOSE DIVISION

12

| | | |
|---|---|---|
| PAULINE K. PARTTI, | ) | Case No. 5:13-cv-04742-PSG |
| Plaintiff, | )<br>)<br>) | **ORDER GRANTING SUMMARY<br>JUDGMENT** |
| v. | )<br>) | **(Re:  Docket No. 32)** |
| PALO ALTO MEDICAL FOUNDATION FOR<br>HEALTH CARE, RESEARCH AND<br>EDUCATION, INC., ET AL., | )<br>)<br>)<br>) | |
| Defendants. | )<br>)<br>) | |

13
14
15
16
17
18
19

20          While working at Defendant Palo Alto Medical Foundation for Health Care, Research and

21    Education, Inc., Plaintiff Pauline K. Partti filed a complaint against an abusive supervisor.  A few

22    years later, she was transferred to Defendant Sutter Health Mills-Peninsula Health Services, where

23    she worked briefly before going on leave, never to return.  Even after construing all evidence of

24    what happened between the complaint, transfer, and leave in the plaintiff's favor, no reasonable

25    juror could find for Partti.  Defendants MPHS and PAMF's motion for summary judgment is

26    GRANTED.

27

28

1

## I.

In October 2006, PAMF offered Partti a job.[1]  After Partti accepted, she worked under the supervision of John Hoebeke.  Hoebeke insulted, threatened, and verbally abused the people working below him, including Partti.[2]  It is unclear if Hoebeke ever singled Partti out for abuse on the basis of her sex, race, age, or national origin.[3]  Partti herself stated that "[t]hreats, yelling, name calling, insults etc are equal opportunity for everyone who works for John . . . . I am NOT singled out. John is very fair in dishing this treatment out equally."[4]  In any case, fed up with this behavior, Partti reported Hoebeke to the human resources department in 2009,[5] and they investigated and agreed with her allegations.[6]

The aftermath of Partti's report is murky.  Partti initially testified that Hoebeke never singled her out for filing a complaint against him, but later changed her testimony.[7]  According to Partti's friend and immediate supervisor Martin Alsip,[8] Hoebeke instructed him to "withhold all career advancement" for Partti for "unspecified reasons though the inference was understood" that it was because of her HR complaint.[9]  Alsip also testified, however, that he had simply never had the opportunity to recommend Partti for promotion."[10]

---

[1] *See* Docket No. 33-1 at Partti Confirmation Letter 1-2.

[2] *See id.* at 89:1-17, 90:7-11.

[3] *Compare id.* at 90:15-92:23 *with* Docket No. 34-2 at Deposition Errata 1-2.

[4] Docket No. 33-1 at DEFENDANTS002066.

[5] *See id.* at Page54-55.

[6] *See id.* at 101:3-105:24.

[7] *Compare id.* at 90:15-92:23 *with* Docket No. 34-2 at Deposition Errata 1-2.

[8] *See* Docket No. 33-1 at 33:20-34:25.

[9] *See* Docket No. 46-2 at ¶ 4.

[10] *See* Docket No. 48-3 at 163:7-23.

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    Regardless, in 2011, Partti received a raise and Hoebeke approved a performance review

2    that stated that she consistently met performance requirements.[11]   In January 2012, due to

3    organizational restructuring, Partti was transferred from PAMF to MPHS and left Hoebeke's chain

4    of command.[12]   Although Partti believed that Hoebeke "was a player" in her move, she was

5    "pleased" and "look[ed] forward to it."[13]   After the transfer, Partti had limited contact with

6    Hoebeke: he called her about four times to discuss work questions and each conversation was two

7    to three minutes and professional.[14]   Partti also saw Hoebeke at two work events, but they did not

8    interact beyond saying hello to each other.[15]

9    Not long after Partti transferred to MPHS, on February 28, 2012, she attended a department

10   lunch meeting.[16]   Many of the allegations underlying Partti's claims arise out of this meeting.

11   During the course of the meeting, Partti said that she and her son occasionally slept outdoors,

12   which Partti believed caused coworker Raquel Saquel to act like she was put off by the comment.[17]

13   Partti also sprayed herself with a can of compressed air to cool herself off.[18]

14   The following day, February 29, 2012, Partti had a meeting with her MPHS supervisors,

15   Nelson Yee and Iftikhar Hussain.[19]   The parties' accounts of the meeting differ significantly: Partti

16   testified that Hussain yelled at her to "shut the fuck up" and "listen" and called her "disgusting"

17   and "inappropriate" with her son.[20]   She also testified that Hussain said "nobody gives a shit about"

18   [11] *See* Docket No. 33-1 at DEFENDANTS001699-1702.

19   [12] *See id.* at 149:21-150:22.

20   [13] *Id.* at 151:13-152:4.

21   [14] *See id.* at 139:4-143:21.

22   [15] *Id.* at 143:24-144:13.

23   [16] *See* Docket No. 34-1 at 278:24-279:2.

24   [17] *See id.* at 283:8-19.

25   [18] *See id.* at 284:12-23.

26   [19] *See* Docket No. 35-2 at 175:6-176:21.

27   [20] Docket No. 34-1 at 295:2-297:25.

28

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

United States District Court
For the Northern District of California

her.[21]  Partti testified that amidst these insults, Hussain did not say anything about her complaint against Hoebeke or her age, gender, race, or national origin.[22]  But she later changed her deposition testimony to state that he did.[23]  She also testified that she believed Yee's conduct in February 2012 was "absolutely not" related to her complaint against Hoebeke.[24]

Yee's account of the meeting differs as to the style of Hussain's conduct.  Yee testified that Hussain discussed Partti's office demeanor, asked her to "back off" and not "overtake the entire staff" when talking, and discussed Partti's comments about her son at the February 28 department meeting.[25]

Shortly after the meeting with Yee and Hussain, Partti contacted the human resources department.  On March 7, 2012, she met with Claudia Christensen, MPHS's Human Resources Executive.[26]  At this meeting, Partti requested a leave of absence and attempted to file complaints about Hussain and Yee's behavior.[27]  Human Resources approved Partti's request for leave.[28]  A few days later, Partti emailed Christensen to file more complaints.  She alleged that assorted MPHS coworkers, specifically Hussain, Yee, Celia Leung, Ginny Marquart, and Saquel had conspired against her and mobbed her.[29]  As evidence of the conspiracy, she wrote that she "believe[d] something 'unethical' may be connecting Raquel to Nelson," because Yee had allegedly repeated

---

[21] *Id.* at 299:5-301:14.

[22] *See id.* at 298:1-23.

[23] *See* Docket No. 34-2 at Deposition Errata 3.

[24] *See id.* at 315:7-12.

[25] *See* Docket No. 35-2 at 178:11-182:22.

[26] *See* Docket No. 36 at ¶ 1.

[27] *See* Docket No. 34-2 at 380:2-19.

[28] *See* Docket No. 36-2 at Plaintif00000436.

[29] *See* Docket No. 34-1 at DEFENDANTS000251-52.

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

something Saquel had said.[30]  Partti also wrote that she feared for her life, suggesting that she

feared MPHS personnel.[31]

Christensen was confused by Partti's emails and sent Partti an email asking if Partti wanted

an HR investigation, and if so, for more information about the complaints, so that she could

investigate Partti's claims.[32]  Partti responded that she wanted an HR investigation, but did not

provide any facts or information for Christensen to follow up on.[33]  Partti then began to believe that

Christensen also was against her, and accordingly never provided Christensen with information

regarding her HR complaints.[34]

Partti remained on leave from March 2012 to June 2013.[35]  During this period, she saw

medical professionals and remained in contact with MPHS HR regarding her ability to return to

work and extensions of her leave.[36]  In June 2013, MPHS terminated Partti's employment, because

she had exhausted all her leave and was effectively on indefinite leave.[37]

---

[30] *Id.*

[31] *Id.*

[32] *See* Docket No. 34-2 at 436:11-437:14, DEFENDANTS000165.

[33] *See id.* at DEFENDANTS000175.

[34] *See id.* at 432:19-435:14.

[35] *See* Docket No. 36-2 at Plaintif00000436-37.

[36] *See* Docket Nos. 36, 37, 40.  The issue of whether Partti was ever cleared to return to work is relevant only to whether Defendants had a legitimate, non-retaliatory reason for ending Partti's employment.  The legitimate, non-retaliatory reason only becomes relevant if Partti establishes a prima facie case for retaliation under her seventh and eighth causes of action.  Because the court finds that those claims are either time-barred or that Partti has not established a prima facie case for those claims, Partti's medical and leave history, including whether she was ever cleared to return to work, are not relevant to summary judgment.  The details of Partti's leave extensions, Dr. Mollah and Dr. Kimmel's assessments of her ability to return to work, and what accommodations, if any, were necessary for her to return to work, are exhaustively documented in the Declarations of Christensen, Annette Barraza, and Lilian Guzman and their accompanying exhibits.  *See* Docket Nos. 36, 36-1, 36-2, 37, 37-1, 37-2, 37-3, 37-4, 37-5, 37-6, 37-7, 37-8, 38-1, 38-2, 38-3, 38-4, 38-5, 38-6, 38-7, 38-8, 38-9, 40, 40-1, 40-2, 40-3, 40-4, 40-5, 40-6, 40-7, 40-8, 41-1, 41-2, 41-3, 41-4, 41-5, 41-6, 41-7.

[37] *See id.*

---

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

1    On July 8, 2013, Partti filed a complaint with California's Department of Fair Employment

2    and Housing alleging harassment, retaliation, and that she had been terminated for

3    whistleblowing.[38]  She then withdrew her complaint[39] and sued Defendants for wrongful

4    termination, breach of employment contract with specific term, breach of employment contract

5    with no specified term, breach of implied covenant of good faith and fair dealing, negligent

6    infliction of emotional distress, intentional infliction of emotional distress, whistleblower

7    retaliation in violation of Cal. Gov. Code § 12940(h) and Cal. Labor Code §§ 98.6, 1102.5, and

8    hostile work environment and retaliation in violation of Title VII.[40]  Defendants move for summary

9    judgment as to all eight causes of action.

**II.**

11    This court has subject matter jurisdiction and supplemental jurisdiction pursuant to 28

12    U.S.C. §§ 1331 and 1367.  The parties further consented to the jurisdiction of the undersigned

13    magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).[41]

14    Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate when "there is no

15    genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

16    law."  Material facts are those that may affect the outcome of the case.[42]  A dispute as to a material

17    fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

18    non-moving party.[43]  All evidence must be viewed in the light most favorable to the non-moving

19    party.  At this stage, a court "does not assess credibility or weigh the evidence, but simply

---

[38] *See* Docket No. 34-2 at EEOC000008.

[39] *See id.* at EEOC000007.

[40] *See* Docket No. 8.

[41] *See* Docket Nos. 7, 10.

[42] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

[43] *See id.*

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

1    determines whether there is a genuine factual issue for trial."[44]   Initially, the moving party bears the

2    burden to show that no genuine issue of material fact exists.[45]   If this burden is met, the burden

3    shifts to the non-moving party.[46]

4        Title VII of the Civil Rights Act of 1964 establishes an administrative framework for

5    employment discrimination and retaliation claims, under which a plaintiff must file a claim with

6    either the Equal Employment Opportunity Commission or a state or local agency before suing in

7    court.[47]   42 U.S.C. § 2000e-5(e)(1) requires employees to file an EEOC claim within 180 days, or a

8    state or local agency claim within 300 days after the alleged unlawful employment practice occurs.

9    *Nat'l R.R. Passenger Corp. v. Morgan* established that "[a] discrete retaliatory or discriminatory

10   act 'occurred' on the day that it 'happened.'  A party, therefore, must file a charge within either

11   180 or 300 days of the date of the act or lose the ability to recover for it."[48]   For a claim of hostile

12   work environment, however, the 180- or 300- day filing window does not entirely apply.  With

13   hostile work environment claims, the court may consider "the entire time period of the hostile

14   environment," including conduct falling outside of the 180- or 300- day window, "for the purposes

15   of determining liability" if "an act contributing to the claim occurs within the filing period."[49]

16       Cal. Gov. Code § 12940(h) makes it illegal for an employer to "discharge, expel, or

17   otherwise discriminate against any person because the person has opposed any practices forbidden

18   under this part or because the person has filed a complaint, testified, or assisted in any proceeding

19   under this part."  To bring a claim under Section 12940(h), a plaintiff must first file a complaint

20   with the California Department of Fair Employment and Housing within one year after the alleged

---

[44] *House v. Bell*, 547 U.S. 518, 559-60 (2006).

[45] *See Celotex Corp. v. Caltrett*, 477 U.S. 317, 323-24 (1986).

[46] *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 630, 630 (9th Cir. 1987).

[47] *See* 42 U.S.C. § 2000e-5(e)(1).

[48] 536 U.S. 101, 110 (2002).

[49] *Id.*

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

1   unlawful practice occurred.[50]  The filing period may be extended by 90 days if the plaintiff does

2   not learn of the facts of the alleged unlawful practice within one year of its occurrence,[51] and the

3   continuing violation doctrine allows a court to consider actions "outside the limitations period" if it

4   is "sufficiently linked to unlawful conduct that occurred within the limitations period."[52]  If the

5   administrative prerequisites are satisfied, the plaintiff must then establish a prima facie case of

6   retaliation by showing that (1) she engaged in a "protected activity," (2) the employer subjected her

7   to an adverse employment action, and (3) a causal link existed between the protected activity and

8   the employer's action.[53]

9         Cal. Labor Code § 98.6 provides in relevant part that an employer may not "discharge . . .

10  discriminate, retaliate, or take any adverse action" against an employee "because the employee . . .

11  engaged in any conduct delineated in" Division Two, Part Three, Chapter Five of the California

12  Labor Code, including Section 1102.5.  As pertinent to Partti's claim, Section 1102.5 prohibits an

13  employer from retaliating against an employer for disclosing a violation of state or federal law to a

14  governmental or law enforcement agency.[54]  As with a Section 12940(h) claim, the plaintiff must

15  show a causal link between the adverse employment action and her disclosure.[55]

16        California's common law of tort provides a cause of action for wrongful termination against

17  public policy.[56]  "Under California law, an employer cannot terminate an employee for a purpose

18  that contravenes public policy."[57]  To establish a claim of wrongful termination against public

---

[50] *See* Cal. Gov. Code § 12960(d).

[51] Cal. Gov. Code § 12960(d)(1).

[52] *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1056 (2005).

[53] *Yanowitz*, 36 Cal. 4th at 1042.

[54] *See* Cal. Labor Code § 1102.5(b).

[55] *See Morgan v. Regents of the Univ. of California*, 88 Cal. App. 4th 52, 69-70 (2001).

[56] See *McCullough v. Xerox Corp.*, Case No. 13-CV-04596-HSG, 2015 WL 5769620, at *9 (N.D. Cal. Oct. 2, 2015).

[57] *Id.* (citing *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 667 (1988)).

8

1   policy, the plaintiff must show that the allegedly violated policy is "(1) delineated in either

2   constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the

3   public' rather than serving merely the interests of the individual; (3) well established at the time of

4   the discharge; and (4) substantial and fundamental."[58]   For a wrongful termination against public

5   policy claim based on a violation of Section 12940(h), the administrative exhaustion requirement

6   does not apply.[59]   However, the plaintiff must show that she meets the substantive requirements of

7   the constitutionally or statutorily delineated policy.[60]

8            Cal. Labor Code § 2922 provides that "[a]n employment, having no specified term, may be

9   terminated at the will of either party on notice to the other."   "An at-will employment may be

10  ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure

11  except the statutory requirement of notice."[61]   However, parties are free to contract to "any

12  limitation, otherwise lawful, on the employer's termination rights,"[62] because "the employment

13  relationship is fundamentally contractual."[63]   A contractual modification of the at-will relationship

14  may be express or implied in fact.[64]   "Where there is no express agreement, the issue is whether

15  other evidence of the parties' conduct has a 'tendency in reason' to demonstrate the existence of an

16  actual mutual understanding on particular terms and conditions of employment."[65]

17

18

19  _____

[58] *Stevenson v. Superior Court*, 16 Cal. 4th 880, 897 (1997).

20

21  [59] *See Stevenson*, 16 Cal. 4th at 890.

22  [60] *See McCullough*, 2015 WL 5769620, at *9.

23  [61] *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 335 (2000) (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 (1988)).

24  [62] *Guz*, 24 Cal. 4th at 336.

25  [63] *Foley*, 47 Cal. 3d at 696.

26  [64] *Guz*, 24 Cal. 4th at 336.

27  [65] *Id.* at 337 (quoting Cal. Evid. Code § 210).

28

9

1   "Every contract imposes upon each party a duty of good faith and fair dealing in its

2   performance and its enforcement."[66]  A breach of the implied covenant of good faith and fair

3   dealing must involve "something beyond breach of the contractual duty itself. . . . If the allegations

4   do not go beyond the statement of a mere contract breach and, relying on the same alleged acts,

5   simply seek the same damages or other relief already claimed in a companion contract cause of

6   action, they may be disregarded as superfluous as no additional claim is actually stated."[67]

7   The elements of a cause of action for intentional infliction of emotional distress are "'(1)

8   outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability

9   of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate

10   causation of the emotional distress.'"[68]  "Severe emotional distress means 'emotional distress of

11   such substantial quality or enduring quality that no reasonable [person] in civilized society should

12   be expected to endure it.'"[69]  Liability for intentional infliction of emotional distress "does not

13   extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[70]

14   "It is for the court to determine whether on the evidence severe emotional distress can be found; it

15   is for the jury to determine whether, on the evidence, it has in fact existed."[71]

16   "A claim of negligent infliction of emotional distress is not an independent tort but the tort

17   of negligence to which the traditional elements of duty, breach of duty, causation, and damages

18   apply."[72]  "[T]o recover damages for emotional distress on a claim of negligence where there is no

19

---

20   [66] *Foley*, 47 Cal. 3d at 683.

21   [67] *Careau & Co. v. Sec. Pac. Bus. Credit, Inc*., 222 Cal. App. 3d 1371, 1394-95, *as modified on
22   denial of reh'g* (Oct. 31, 2001).

23   [68] *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1376 (2010) (quoting *Agarwal v. Johnson* 25 Cal. 3d
     932, 946 (1979)).

24   [69] *Potter v. Firestone Tire & Rubber Co*., 6 Cal. 4th 965, 1004 (1993).

25   [70] *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) (internal quotation omitted).

26   [71] *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal. App. 3d 376, 397 (1970).

27   [72] *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1377 (2010).

28

10

United States District Court
For the Northern District of California

1  accompanying personal, physical injury, the plaintiff must show that the emotional distress was

2  'serious.'[73]  "'[S]evere emotional distress' is functionally the same as the articulation of 'severe

3  emotional distress'" required for a claim of intentional infliction of emotional distress.[74]  The

4  statute of limitations for a negligence tort claim is two years.[75]

5                                              **III.**

6          Applying the standards as set forth above, none of Partti's claims survive.

7          ***First***, Partti's eighth cause of action for a hostile work environment and retaliation in

8  violation of Title VII is untimely as to most of the alleged unlawful conduct, and there is no

9  genuine issue of material fact as to the rest of the conduct.  Partti filed an administrative complaint

10  with DFEH on July 8, 2013.[76]  Under Section 2000e-5(e)(1)'s 300-day deadline, Partti can sue only

11  for Title VII retaliation violations that occurred between September 11, 2012, and July 8, 2013.  As

12  for the hostile work environment part of the Title VII claim, Partti can only sue if at least some of

13  the conduct causing the hostile work environment occurred after September 11, 2012.

14          Partti argues that the continuing violation doctrine saves her hostile work environment

15  claim from being untimely and allows the court to consider pre-September 11, 2012 conduct.[77]

16  However, *Morgan* says otherwise, by mandating that at least some part of the conduct occur during

17  the window of timeliness.  In other words, some part of the offensive hostile work environment

18  conduct must have occurred on or after September 11, 2012.  Partti's leave began on March 6,

19  2012, and she never returned to work at MPHS.[78]  The last day that conduct relating to a hostile

20  work environment could have occurred was March 6, 2012, and so none of the hostile work

21

22  [73] *Id.* (quoting *Molien v. Kaiser Foundation Hospitals*, 27 Cal. 3d 916, 927-30 (1980)).

23  [74] *Wong*, 189 Cal. App. 4th at 1378 (2010).

24  [75] Cal. Code Civ. Proc. § 335.1.

25  [76] *See* Docket No. 32 at 12.

26  [77] *See* Docket No. 46 at 5.

27  [78] *See* Docket No. 36-2 at Plaintiff00000436.

28

                                              11

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

environment conduct occurred within the 300-day window.  The hostile work environment part of the Title VII claim is untimely.

Most of the conduct supporting Partti's Title VII retaliation claim also is untimely, and the rest of it lacks any evidence by which a reasonable jury could find for Partti.  After reviewing every scrap of evidence presented by the parties and taking all of it in the light most favorable to Partti, the court has identified the following instances of alleged retaliatory conduct that could be construed as relating to a Title VII retaliation claim and disposes of them as follows:[79]

- **Hoebeke's alleged harassment of Partti while she was at PAMF**:[80] all of this conduct happened, if at all,[81] before Partti's transfer to MPHS in January 2012.  Partti testified that she had minimal contact with Hoebeke after her transfer, none of which a reasonable jury could find was discriminatory or retaliatory.[82]  Any Title VII claim based on Hoebeke's conduct at PAMF is untimely.

- **Hoebeke's alleged order that Alsip not promote Partti**:[83] Partti left Hoebeke and Alsip's chain of command, and their authority over her promotions, when she transferred to MPHS

[79] Because the court finds that Partti's Title VII claim is untimely and lacks sufficient evidence for a reasonable jury to find that the alleged conduct occurred, the court does not reach the issue of whether the alleged conduct establishes a prima facie case for retaliation, with the exception of Guzman's alleged refusal of accommodations, discussed below.

[80] *See* Docket No. 33-1 at 89:1-17, 90:7-11.

[81] While the record is undisputed that Hoebeke insulted and verbally abused Partti and other staff working beneath him, there is some dispute as to whether Hoebeke singled Partti out for verbal abuse on the basis of her sex, race, age, or national origin, or her HR complaint about him. *Compare* Docket No. 33-1 at 90:15-92:23 *with* Docket No. 34-2 at Deposition Errata 1-2.  The court notes that Partti submitted her deposition errata much later than the 30 days after deposition that Rule 30(e)(1) permits.  The court does not reach the issue of whether the errata are admissible, however, because it finds that the claims related to the errata are time-barred as a matter of law.

[82] *See* Docket No. 33-1 at 143:24-144:13, 139:4-143:21 (describing Partti's post-transfer contact with Hoebeke as approximately four brief phone calls on work issues or where Yee was, and two encounters in person where they said hello to each other and nothing else).

[83] There is mixed evidence as to whether Hoebeke ordered Alsip not to promote Partti.  Partti testified that after she complained against Hoebeke, other PAMF accountants were promoted but she was not, and when she asked Alsip why, he said, "You know why."  Docket No. 34-1 at 174:14-23.  Alsip himself testified that he never had the opportunity to recommend Partti for

12

in January 2012, well before September 11, 2012.  Any Title VII claim based on Hoebeke's alleged order not to promote Partti is untimely.

- **Partti's transfer to MPHS in 2012**: Partti was transferred in January 2012.  The court does not address whether the transfer was an adverse employment action because there is no dispute that it is outside the 300-day window and any Title VII claim based on the transfer is untimely.

- **Partti's MPHS colleagues' alleged conduct at the February 28, 2012 department lunch**: it is unclear whether Partti's colleagues' conduct at the February 28 meeting could even remotely be characterized as discriminatory or retaliatory, but it occurred before September 11, 2012, and so any Title VII claim based on this conduct is untimely.

- **Yee and Hussain's alleged conduct at the February 29, 2012 meeting**: it is unclear whether Yee and Hussain's alleged conduct at their private meeting with Partti was discriminatory or retaliatory,[84] but it occurred before September 11, 2012, and so any Title VII claim based on this conduct is untimely.

- **Hussain, Yee, Leung, Marquart, and Saquel's alleged mobbing of Partti**: Partti does not provide any evidence to support her allegations that these individuals "mobbed" her, let alone sufficient evidence for a reasonable jury to find for her on this claim.  However, any

---

promotion and never picked someone else over her to fill an opening, because she was simply never in consideration for the next slot when promotions became available.  *See* Docket No. 48-3 at 163:7-23.  Alsip later stated in a declaration that Hoebeke told him to "withhold all career advancement" for Partti and that "the inference was understood" that it was because she had complained.  *See* Docket No. 46-2 at ¶ 4.  While such evidence might normally create a genuine dispute of material fact, the claim is untimely.

[84] Partti affirmatively testified at deposition that while Hussain yelled at her to "shut up and listen," called her "disgusting" and "inappropriate", and said that "nobody [gave] a shit about" her, he did not say anything about her age, gender, race, national origin, or complaint against Hoebeke. Docket No. 34-1 at 295:2-298:23.  The deposition errata said that he did.  *See* Docket No. 34-2 at Deposition Errata 3.  The court notes that Partti submitted her deposition errata much later than the 30 days after deposition that Rule 30(e)(1) permits.  The court does not reach the issue of whether the errata are admissible, however, because it finds that the claims related to the errata are time-barred as a matter of law.

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

1    mobbing would have ended when Partti went on leave in March 2012,[85] and so any Title

2    VII claim based on this conduct is untimely.

- **Leung, Hoebeke, Hussain, and Yee's alleged collaborative fabrication of misconduct
  by Partti**: Partti alleges—without any facts or evidence to support her allegations—that
  Yee and Hussain's actions at the February 28 and 29 meetings were part of a collaboration
  with Hoebeke and Leung to fabricate claims of misconduct against Partti.[86] Not only is a
  speculative, unsupported allegation insufficient to survive summary judgment, any Title VII
  claim based on conduct occurring in February 2012 is untimely.

- **Leung's alleged fabrication of complaints against Partti**: Partti's personal notes on the
  timeline of events state that in April 2012, she learned that Leung had made up complaints
  that Partti had exposed her breasts at work and made a comment about oral sex.[87] If Leung
  made these complaints at all—and there is no evidence that she did—she did so before
  September 11, making any Title VII claim based on her conduct untimely.

- **Guzman's alleged refusal to grant Partti accommodations**: Partti states in her
  declaration that Guzman refused to provide the reasonable accommodations that Partti
  needed to return to work.[88] Leaving aside the questions of whether the accommodation was
  reasonable,[89] there is no evidence remotely hinting that this refusal was connected to Partti
  engaging in a protected activity,[90] and so there is no Title VII claim.

---

[85] Partti made this allegation by email on March 9, 2012. *See* Docket No. 34-1 at
DEFENDANTS000251-52. Any mobbing conduct raised in that allegation therefore is untimely.
There is no evidence that the alleged mobbing continued after Partti went on leave (or occurred at
all), and so there is no Title VII claim, timely or otherwise.

[86] *See* Docket No. 46-1 at ¶ 2.

[87] *See* Docket No. 34-1 at MOLLAH 000012; *see also* Docket No. 46-1 at ¶ 8.

[88] *See* Docket No. 46-1 at ¶ 6.

[89] *See* Docket No. 45-1 at DEFENDANTS000976-77, 000986 (fitness for duty evaluation finding
no "accommodations or restrictions required for [Partti's] return to work").

[90] The court has closely scrutinized the record and Partti does not identify any nexus between the
alleged refusal of accommodation and any protected activity, as she must do to establish a prima
facie case of Title VII retaliation. *See Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988).

14

*United States District Court
For the Northern District of California*

United States District Court
For the Northern District of California

1      •  **Leung, Christensen, Guzman, and Barraza's alleged collaboration to not investigate**

2        **Partti's complaints at MPHS ("MPHS HR conspiracy")**: no evidence exists in the

3        record that even suggests that these individuals collaborated to avoid investigating Partti's

4        complaints, fabricate allegations to prevent her return to work, or otherwise participate in

5        the alleged retaliatory mobbing campaign, other than Partti's statement in her declaration

6        that she is "informed and believe[s]" that it is so.[91]  Partti's speculative allegation is

7        insufficient for any reasonable jury to find that this conduct occurred, let alone that it was in

8        retaliation for a protected activity.[92]  Partti must "do more than simply show that there is

9        some metaphysical doubt as to the material facts. . . . [She] must come forward with

10       'specific facts showing that there is *a genuine issue for trial*.'"[93]

11          Furthermore, Christensen's undisputed testimony states that she had no detailed

12       knowledge of Partti's employment at PAMF, let alone her complaint against Hoebeke,

13       further undermining the possibility of retaliation based on that complaint.[94]  There is

14       undisputed evidence that Christensen did not investigate Partti's complaints, but it is

15       equally undisputed that she did so not to retaliate but because she could not understand

16       what Partti's complaints were.[95]  Christensen asked Partti for more information about her

17       complaints and told Partti that she needed the information in order to conduct an

18       investigation.[96]  Partti refused to reply, however, believing that Christensen was part of the

19

20      [91] Docket No. 46-1 at ¶ 9.

21      [92] *See Gordon v. Metro. Life Ins. Co.*, __ F.Supp.3d __, Case No. 5:10-CV-05399-EJD, 2015 WL
22      1940209, at *2 (N.D. Cal. Apr. 29, 2015) ("[T]he mere suggestion that facts are in controversy, as
23      well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to
      defeat summary judgment.").

24      [93] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed.
25      Rule Civ. Proc. 56(e)).

26      [94] *See* Docket No. 34-2 at DEFENDANTS000165.

27      [95] *See* Docket No. 35-3 at 96:7-12, 194:16-195:24.

28      [96] *See* Docket No. 34-2 at 436:11-437:14, DEFENDANTS000165, DEFENDANTS000175.

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1  campaign against her,[97] and so Christensen did not investigate.  The evidence presented by

2  Partti would not allow any reasonable jury to find for her on this issue.

3  • **Hoebeke's alleged conspiracy with MPHS staff to retaliate against Partti for**

4  **complaining against him**: no evidence exists that suggests that Hoebeke conspired with

5  MPHS staff.  Alsip's declaration states that PAMF and MPHS "are closely interrelated" and

6  that Hoebeke "worked with senior members with influence over the operations of

7  MPHS."[98]  This bare, unsupported allegation provides insufficient facts for a reasonable

8  jury to find that Hoebeke ever conspired with MPHS staff against Partti.[99]

9  ***Second***, Partti's seventh cause of action for retaliation in violation of Cal. Gov. Code §

10  12940(h), Cal. Labor Code § 98.6, and Cal. Labor Code § 1102.5 also fail.  Turning first to the

11  Section 12940(h) claim, it fails due to untimeliness and a complete lack of any evidence supporting

12  her allegations of unlawful conduct.  Partti filed an administrative complaint with DFEH on July 8,

13  2013.[100]  Under Section 12960(d)'s one-year deadline, Partti can only sue under Section 12940(h)

14  for retaliatory conduct that occurred between July 8, 2012 and July 8, 2013.  The continuing

15  violation doctrine does not salvage Partti's Section 12940(h) claim because there is no evidence

16  showing that unlawful conduct occurred within the limitations period, let alone that unlawful

17  conduct outside the limitations period was "sufficient linked" to unlawful conduct within the

18  limitations period.[101]  All the conduct that the court identified above as untimely under Title VII

19  also is untimely under Section 12960(d)(1), because none of it occurred during the one-year filing

20  window.  There is no evidence suggesting that the remaining alleged conduct[102] occurred, much

---

[97] *See* Docket No. 34-2 at 432:19-435:14, 437:6-14, 440:12-16.

[98] Docket No. 46-2 at ¶ 5.

[99] *See Gordon*, 2015 WL 1940209, at *2; *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.

[100] *See* Docket No. 32 at 12.

[101] *Yanowitz*, 36 Cal. 4th at 1056.

[102] Namely, Guzman's alleged refusal to grant Partti accommodations; the MPHS HR conspiracy; and Hoebeke's alleged conspiracy with MPHS staff.

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

1   less that it was tied to Partti engaging in protected activity, as is required for a claim under Section

2   12940(h).

3          As for the Cal. Labor Code §§ 98.6 and 1102.5 claim, it fails due to a lack of nexus

4   between the protected activity and the adverse employment action.  To survive summary judgment

5   on this claim, Partti must show facts sufficient for a reasonable jury to find that she disclosed a

6   violation of state or federal law to a governmental or law enforcement agency, that she suffered an

7   adverse employment action, and that the two events were connected.  Partti filed a complaint with

8   the DFEH in July 2013, which is a disclosure to a government agency.  However, MPHS

9   terminated her employment in June 2013, before Partti made her DFEH complaint.  There is no

10   evidence showing that the July complaint caused MPHS to fire Partti in June, a month before she

11   made the complaint, and no reasonable jury could find for Partti on this issue.

12          *Third*, Partti's first cause of action for wrongful termination in violation of public policy

13   fails as a matter of law.  This claim is premised on a violation of Section 12940(h),[103] so Partti

14   must show that she can satisfy the elements of a Section 12940(h) retaliation claim: engagement in

15   a protected activity, an adverse employment action, and a causal link connecting the two.

16   However, Partti has not established a prima facie case.  Partti argues that she engaged in protected

17   activity when she complained against Hoebeke at PAMF and when she complained against

18   assorted MPHS staff in March 2012.  In the context of the wrongful termination claim, she argues

19   that MPHS subjected her to an adverse employment action by wrongfully terminating her in 2013.

20   However, Partti presents no evidence supporting a connection between her termination and her

21   complaints at PAMF and MPHS.  The only evidence supporting a connection between the Hoebeke

22   complaint and Partti's termination is her unsupported belief that Leung, Hoebeke, Hussain, and

23   Yee collaborated against her,[104] and Alsip's statements that PAMF and MPHS are related and that

24

25

26   ───────────────────

[103] *See* Docket No. 8 at ¶¶ 38-43.

27   [104] *See* Docket No. 46-1 at ¶ 2.

28

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

1    Hoebeke worked with senior MPHS staff.[105]  Such speculative evidence is too flimsy to create a

2    genuine dispute of material fact.[106]

3          Partti also fails to connect her attempted complaints against various MPHS staff with her

4    termination.  She provides no evidence based on which a reasonable jury could find that the

5    termination was connected with her March 2012 complaints to Christensen.  The undisputed

6    evidence shows that Christensen did not understand what Partti's complaints were, requested more

7    information from Partti, and never received it.[107]  Based on the evidence, even if Partti's March

8    2012 complaints qualify as protected activity,[108] there is no evidence connecting Partti's

9    termination to her complaints.

10          *Fourth*, no reasonable juror could find for Partti on her second and third causes of action

11   for breach of employment contract.  While the second cause of action is styled as breach of

12   employment contract with specific term[109] and the third as breach of employment contract with no

13   specified term,[110] both causes of action rest on the same theory of contractual modification and fail

14   accordingly.

15          The evidence is clear that Partti's employment contract was at-will: her PAMF and MPHS

16   offer letters clearly stated that[111] and Partti testified that she understood that her employment at

17   PAMF and MPHS was at-will, that she knew she could be fired without cause, and that she

18

19   [105] Docket No. 46-2 at ¶ 5.

20   [106] *See Gordon*, 2015 WL 1940209, at *2; *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.

21   [107] *See* Docket No. 35-3 at 96:7-12, 194:16-195:24; Docket No. 34-2 at 432:19-435:14, 436:11-
     437:14, 440:12-16, DEFENDANTS000165, DEFENDANTS000175.

22
     [108] *Yanowitz*, 36 Cal. 4th at 1047 ("Although an employee need not formally file a charge in order
23   to qualify as being engaged in protected opposing activity . . . complaints about personal
     grievances or vague or conclusory remarks that fail to put an employer on notice as to what
24   conduct it should investigate will not suffice to establish protected conduct.")

25   [109] *See* Docket No. 8 at 8.

26   [110] *See id.* at 9.

27   [111] *See* Docket No. 33-1 at Partti Confirmation Letter 2, DEFENDANTS001169.

28
     Case No. 5:13-cv-04742-PSG
     ORDER GRANTING SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1   understood her employment would be at-will before she signed the PAMF and MPHS offer

2   letters.[112]  Partti also testified that no one at PAMF or MPHS represented to her that her

3   employment was not at-will.[113]

4          Partti argues MPHS and PAMF modified the at-will nature of her employment by creating

5   an implied-in-fact contract that her employment would only be terminated for cause.[114]  She makes

6   this argument based on the MPHS and PAMF handbooks and various workplace memoranda.[115]

7   However, Partti signed a form acknowledging that the PAMF handbook "does not, in any way,

8   constitute an employment contract or an assurance of continued employment."[116] She signed a

9   similar acknowledgment regarding the MPHS handbook.[117]  She testified that she understood both

10  forms before signing them.[118]  Under *Guz* and *Foley*, the court must look at the "'totality of

11  circumstances' . . . to determine whether the parties' conduct, considered in the context of

12  surrounding circumstances, gave rise to an implied-in-fact contract limiting the employer's

13  termination rights."[119]  Defendants' uncontroverted evidence shows that there was no "meeting of

14  the minds"[120] that the at-will employment contracts were expressly or impliedly modified to be for-

15  cause employment contracts, and Partti presents no evidence to support her theory of contract

16  modification.

---

19  [112] *See id.* at 61:15-63:17, 152:12-153:19.

20  [113] *See id.* at 64:23-65:8, 152:12-154:20.

21  [114] *See* Docket No. 8 at ¶¶ 44-69; Docket No. 46 at 8-9.

22  [115] *See* Docket No. 8 at ¶¶ 44-69; Docket No. 46 at 8-9.

23  [116] *See* Docket No. 33-1 at Page53;

24  [117] *See* Docket No. 48-1 at DEFENDANTS001180.

25  [118] *See* Docket No. 33-1 at 63:23-66:3, 152:12-154:20.

26  [119] *Guz*, 24 Cal. 4th at 337 (quoting *Foley*, 47 Cal. 3d at 681).

27  [120] *Guz*, 24 Cal. 4th at 337.

28

19

1

2      **Fifth**, no reasonable jury could find for Partti on her fourth cause of action for a breach of

3  the implied covenant of good faith and fair dealing.  In order for Defendants to have breached the

4  implied covenant, there must be a contract to breach.  As discussed above, there is no support for

5  Partti's allegation that PAMF and MPHS's handbooks and memoranda created a modified

6  employment contract.  Furthermore, this cause of action relies on the same allegations as the

7  breach of contract claims, and *Careau* is clear that in such circumstances, "no additional claim is

8  actually stated."[121]

9      **Sixth**, no reasonable jury could find for Partti on her fifth cause of action for negligent

10  infliction of emotional distress or her sixth cause of action for intentional infliction of emotional

11  distress.  Both causes of action require evidence that Partti experienced severe emotional distress of

12  "such substantial quality or enduring quality that no reasonable [person] in civilized society should

13  be expected to endure it," and there is no such evidence.[122]

14      Partti bases her emotional distress claims on the following conduct: Hoebeke's verbal

15  threats and alleged conspiracy with MPHS staff to destroy her career; Leung's alleged complaints

16  against Partti; the alleged MPHS HR conspiracy to not investigate Partti's complaints; and Hussain

17  and Yee's alleged insults, shouting, pedophilia accusation, and false imprisonment of her.  As

18  discussed above, there is no evidence showing that the Hoebeke-MPHS conspiracy, Leung's

19  complaints, or the MPHS HR conspiracy ever occurred, let alone sufficient evidence such that a

20  reasonable jury could find that these actions caused Partti severe emotional distress.  As for

21  Hoebeke's verbal abuse and threats at PAMF, threats and insults do not create liability for

22  intentional infliction of emotional distress.[123]  The same goes for Hussain and Yee's alleged verbal

---

[121] *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1394-95, *as modified on denial of reh'g* (Oct. 31, 2001).

[122] *Potter*, 6 Cal. 4th at 1004; *Wong*, 189 Cal. App. 4th at 1378 (2010).

[123] *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) (internal quotation omitted); *see also Schneider v. TRW, Inc.*, 938 F.2d 986, 992–93 (9th Cir. 1991) (affirming summary judgment against plaintiff's IIED claim where her supervisor "screamed and yelled in the process of criticizing her performance, threatened to throw her out of the department and made gestures she interpreted as threatening").

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT

insults and shouts.  As for the allegation of false imprisonment, there is no claim for false imprisonment and Partti has not pleaded facts or proffered evidence showing that Hussain and Yee falsely imprisoned her.

**IV.**

Defendants' motion for summary judgment is GRANTED as to all claims.  A separate order shall issue entering judgment.

**SO ORDERED.**

Dated: November 2, 2015

PAUL S. GREWAL
United States Magistrate Judge

Case No. 5:13-cv-04742-PSG
ORDER GRANTING SUMMARY JUDGMENT